THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK_____X

DONNELL BAINES,

                              Plaintiff,

        -against-

KIMBERLY C. MITCHELL, Individually and
as a co-conspirator with the herein
Defendants Officers; Brian White;
Individually and as a Police Officer for
the City of New York; PETER GUYHEEN,
Individually and as a Police Officer for
the City Of New York; MICHAEL DELMERICO,
Individually and as a Police Officer for
the City of New York; JOHN CHRISTMAN,
Individually and as a Police Officer for
the City of New York; JOSEPH LEONARD,
Individually and as a Police Officer for
the City of New York; CHRIS MCNERNEY,
Individually and as a Police Officer for
the City of New York; JOSEPH CUTRONE,
Individually and as a Police Officer for
the City of New York; and, ROBERT
ODONOGHUE, Individually and as a Police
Officer for the City of New York,
_____Defendants.___X

42 U.S.C. §1983
         AND
28 U.S.C. §1332

**VERIFIED AMENDED COMPLAINT**

**TRIAL BY JUDGE DEMANDED**

10-CIV-9545 (JMF)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 11/17/14



RECEIVED
NOV 17 2014
PRO SE OFFICE

### JURISDICTION AND VENUE

1) This is a civil action authorized by both 42 U.S.C. §1983 and

28 U.S.C. §1332, being brought by the Plaintiff who seeks redress for

the deprivation of his Constitutional rights under color of State law

and for various torts committed by the Defendants herein.

2) This Court has Jurisdiction under 28 U.S.C. 1331; 28 U.S.C. §1343;

and 28 U.S.C. §1332, and the Southern District of New York is the

appropriate venue under 28 U.S.C. §1367.

### CHARACTER OF THE PARTIES

3) Donnell Baines, at all times hereinafter mentioned is the Plaintiff,

and is a citizen of the United States and a resident of N.Y. State.

4) Defendant Kimberly C. Mitchell (hereinafter referred to as "Mitchell"), at all time relevant to the complaint being mentioned herein, did deprive the Plaintiff of his Constitutional rights under color of law, and, did commit various torts against the Plaintiff, being a resident of the State of California, and the amount in dispute between Plaintiff and Mitchell exceeds $75,000 (U.S.D.), exclusive of costs and interests (**42 U.S.C. §1983 & 28 U.S.C. 1332**).

5) Defendant Brian White, being sued in his professional and his individual capacities (hereinafter referred to as "Officers"), at all times relevant to the complaint and being mentioned herein, did deprive the Plaintiff of his Constitutional rights under color of law (**42 U.S.C. §1983**).

6) Defendant Peter Guyheen, being sued in his professional and his individual capacities (hereinafter referred to as "Officers"), at all times relevant to the complaint and being mentioned herein, did deprive the Plaintiff of his Constitutional rights under color of law (**42 U.S.C. §1983**).

7) Defendant Michael Delmerico, being sued herein in his professional and individual capacities (hereinafter referred to as "Officers"), at all times relevant to the complaint and being mentioned herein, did deprive the Plaintiff of his Constitutional rights under color of law (**42 U.S.C. §1983**).

8) Defendant John Christman, being sued in his professional and his individual capacities (hereinafter referred to as "Officers"), at all times relevant to the complaint and being mentioned herein, did deprive the Plaintiff of his Constitutional rights under color of law (**42 U.S.C. § 1983**).

9) Defendant Joseph Leonard , being sued in his professional and his individual capacities (hereinafter referred to as "Officers"), at all time relevant to the complaint and being mentioned herein, did deprive the Plaintiff of his Constitutional rights under color of law (**42 U.S.C. §1983**).

10) Defendant Chris McNerney, being sued in his professional and his individual capacities (hereinafter referred to as "Officers"), at all times relevant to the complaint and being mentioned herein, did deprive the Plaintiff of his Constitutional rights under color of law (**42 U.S.C. §1983**).

11) Defendant Joseph Cutrone, being sued in his professional and his individual capacities (hereinafter referred to as "Officers"), at all times relevant to the complaint and being mentioned herein, did deprive the Plaintiff of his Constitutional rights under color of law (**42 U.S.C. §1983**).

12) Defendant Robert Odonoghue, being sued herein in his professional and his individual capacities (hereinafter referred to as "Officers"), at all times relevant to the complaint and being mentioned herein, did deprive the Plaintiff of his Constitutional rights under color of law (**42 U.S.C. §1983**).

<u>FACTS OF THE COMPLAINT</u>

13) On or about April 1st, 2009, Defendant Mitchell (hereinafter referred to as "Mitchell") did move into Plaintiff's residence which was located at 1475 2nd Avenue, Apartment #5h (hereinafter referred to as "Plaintiff's residence"), in New York City, New York.

14) During Mitchell's residency at the Plaintiff's residence, Mitchell shared authority over the residence with the Plaintiff.

15) On or about September 15th, 2009, Plaintiff and Mitchell had a dispute concerning certain property of the Plaintiff's that was missing from Plaintiff's residence, and, thereafter, an agreement was made between Plaintiff and Mitchell, wherein, Mitchell would relinquish her authority over the Plaintiff's residence and vacate said residence on October 1st, 2009.

16) During the period of on or about September 15th, 2009, to on or about October 1st, 2009, without either the consent of or knowledge of the Plaintiff, Mitchell did make an unauthorized copy of the keys to the Plaintiff's residence without Plaintiff's permission.

17) On or about October 1st, 2009, Mitchell did willingly: relinquish her authority of Plaintiff's residence; remove about half of her belongings from Plaintiff's residence; return her original copy of keys to said residence to the Plaintiff; and vacate said residence, however, Mitchell did keep the unauthorized copy of keys to said residence without Plaintiff's knowledge or consent, with unlawful intent.

18) On or about October 18th, 2009, Mitchell called Plaintiff's phone and informed him that she was outside his residential building.

4

19) During this conversation, Mitchell informed Plaintiff that she was in the company of police officers because she wanted to retrieve the remainder of her personal belongings, but was scared to come alone.

20) Mitchell thereafter, requested to come up to Plaintiff's residence to retrieve said belongings, to which Plaintiff consented.

21) Thereafter, Plaintiff did press the "door" button, located on the intercom unit in the Plaintiff's residence, thereby unlocking the front door to Plaintiff's residential building, thereby allowing both Mitchell and the officers accompanying her access to the Plaintiff's residential building.

22) Thereafter, Mitchell and the accompanying officers made their way to the fifth floor of said residential building where Plaintiff's residence is located (#5h).

23) Upon Mitchell's and the officers' arrival on the fifth floor, Plaintiff opened his residence door and allowed both Mitchell and the officers to enter therein, for the sole purpose of allowing Mitchell to gather and remove all of the remainder of her personal belongings from Plaintiff's residence.

24) As such, on the above date of October 18th, 2009, Mitchell did, in the company of these officers, remove all of the remainder of her personal belongings from the Plaintiff's residence, leaving none of her belongings therein.

25) The Officers accompanying Mitchell did thereafter, create an incident report, wherein they stated that said Officers accompanied Mitchell to Plaintiff's residence; that Mitchell removed all of her personal belongings from Plaintiff's residence; and, that all of these occurrences took place under their observation, and, said incident report was dated October 18th, 2009, and filed under incident number 2009-19-001071.

26) Upon information and belief, some or all of the officers escorting Mitchell to Plaintiff's residence on October 18th, 2009, to remove her belongings therefrom, are named herein as Defendant Officers, and as such, said Defendants Officer were fully aware that Mitchell previously removed all of her belongings from the Plaintiff's residence and vacated said residence on the date of the Constitutional violations complained of herein, December 8th, 2009 (See, ¶'s #44 - #115, infra, herein).

27) Thereafter, on or about October 21st, 2009, Plaintiff did receive a phone call from Mitchell, wherein Mitchell requested permission from the Plaintiff to come over to the Plaintiff's residence for a "social visit", to which, Plaintiff agreed.

28) Thereafter, on the same date, upon Mitchell's arrival at Plaintiff's residence, Plaintiff did inform Mitchell that she could not stay at the Plaintiff's residence when the Plaintiff was not there, and also, that if Mitchell desired to come to Plaintiff's residence for a "social visit" Mitchell would be required to call well in advance of coming over to seek Plaintiff's permission to do so.

29) At the above date and time, by explaining the terms upon which Mitchell would be admitted into Plaintiff's residence, Plaintiff did remove any doubts that Mitchell may have entertained as to her not having authority over the Plaintiff's residence.

30) During the period of on or about October 21st, 2009, to on or about December 7th, 2009, Mitchell was an "infrequent visitor" to the Plaintiff's residence, knowing full well during this entire period that she had no authority over Plaintiff's residence.

31) On or about December 7th, 2009, Mitchell and the Plaintiff's then girl-friend did get into a physical altercation within Plaintiff's residence, which Plaintiff, thereafter, did break up.

32) Plaintiff did, thereafter, remove Mitchell from said residence and did inform Mitchell never to return to said residence.

33) During Mitchell's removal from said residence, Mitchell stated to the Plaintiff that she was going to have the Plaintiff and his then girl-friend arrested.

34) On or about December 8th, 2009, at or about 1p.m., Plaintiff did receive a menacing and threatening phone call from Mitchell, wherein Mitchell threatened Plaintiff's safety, stating that Mitchell was going to bring some people to Plaintiff's residence to beat him up and put him in the hospital, and, that Mitchell was going to lie to the Police, by informing police that it was Plaintiff who assaulted her, thereby having Plaintiff arrested, and upon Plaintiff's release therefrom, Mitchell would have her friends rob Plaintiff in his home.

35) As a direct and proximate result of Mitchell's threats, the Plaintiff suffered emotional distress, mental anguish, and became extremely fearful for his life and his safety.(See, ¶ #126, infra, herein).

36) On or about December 8th, 2009, at or on about 1:30p.m., Mitchell did begin to bang violently on the front door of Plaintiff's residence (#5h) while screaming for the Plaintiff to open the door.

37) Plaintiff, thereafter, did look through the "peep hole" of his residence's front door, and did observe Mitchell in front of his residence door in the company of two unknown African American males.

38) Plaintiff, thereafter, did then speak through his closed residence door and did inform Mitchell and the two unknown males that if they did not all leave Plaintiff's residential building that Plaintiff would call the police.

39) Thereafter, Mitchell and the two unknown males threatened Plaintiff by stating that they would be coming back, or, that they would find Plaintiff on the street and harm Plaintiff, after which, Mitchell and the two unknown males did leave the Plaintiff's residential building.

40) As a direct and proximate result of the aforementioned threats made by Mitchell and the two unknown males, Plaintiff did suffer extreme emotional distress, anxiety, mental anguish, and became extremely fearful for his life and his safety.(See, ¶ #126, infra, herein).

41) The Plaintiff, who by this time felt unsafe in his own home, left therefrom and traveled to Plaintiff's parent's home, located at 207-01 94th Avenue, Queens Village, New York, where Plaintiff did inform both his father and his sister about what Mitchell had done.

42) Plaintiff's father and sister, thereafter, informed Plaintiff that if Mitchell ever returns to Plaintiff's residence, Plaintiff must call the police.

43) Plaintiff, thereafter, did leave his parents home and travel back to Plaintiff's residence, arriving at said residence at or about 6p.m. on December 8th, 2009.

44) On December 8th, 2009, at or about 8p.m., the Plaintiff did receive a phone call from Mitchell, wherein Mitchell informed Plaintiff that her phone was on the "speaker phone" setting; that Mitchell was in the company of the Defendant Officers (hereinafter referred to as "Officers"; and, that said Officers could hear the Plaintiff, due to Mitchell's phone being on "speaker".

45) Thereafter, Mitchell requested Plaintiff's permission to come up to Plaintiff's residence, to which, Plaintiff refused to consent to Mitchell's and the Officers' entry into Plaintiff's residence.

46) Thereafter, an Officer, identifying himself as such, spoke to and informed Plaintiff over the phone that Mitchell just wanted to come up to Plaintiff's residence to retrieve her belongings, to which, the Plaintiff replied that Mitchell had no belongings in said residence.

9

47) Upon information and belief, the same Officers who Plaintiff informed of the fact that Mitchell no longer had any belongings in his residence were the same Officers who were present on or about October 18th, 2009, when Mitchell removed all of her personal belongings from the Plaintiff's residence, and as such, the Officers herein did have knowledge that Mitchell did not live in, or, have any belongings in the Plaintiff's residence.

48) Upon further information and belief, the Officer which the Plaintiff was speaking to during this phone conversation did identify himself as "Officer White".

49) Officer White then informed Plaintiff that said Officer had been informed by Mitchell that Mitchell lived in Plaintiff's residence, to which, Plaintiff responded that Plaintiff lived alone and had his lease to prove it, and, that although Mitchell had lived at Plaintiff's residence in the past, Mitchell vacated said residence on October 18th, 2009, and removed all of her belongings on that date and no longer has any authority to enter into Plaintiff's residence.

50) As such, Plaintiff explicitly refused to consent to both Mitchell's and the Officers' request to enter Plaintiff's residence.

51) Officer White than informed Plaintiff that Mitchell had informed said Officer that Mitchell and Plaintiff were in a romantic relationship and that Mitchell possessed keys to the Plaintiff's residence, to which, Plaintiff responded that Mitchell and the Plaintiff were not in any relationship, and, that Mitchell's possession of keys to the Plaintiff's residence was unauthorized and illegal , and requested said Officers to arrest Mitchell for possession of Plaintiff's stolen property.

52) The Officers did not arrest Mitchell for her unauthorized and illegal possession of Plaintiff's property, to wit: an illegally made and possessed copy of Plaintiff's residence keys, notwithstanding the fact that Plaintiff provided the Officers with sufficient probable cause and requested the Officers to arrest Mitchell.

53) Officer White then stated, "Well, she says she's lives there so we have to believe her", to which Plaintiff responded that Mitchell had not shown the Officers anything proving she in fact lived at the Plaintiff's residence, nor does Mitchell's identification have the Plaintiff's residential address on it, nor does Mitchell have any recent mail with both her name and Plaintiff's residential address on it.

54) Plaintiff further stated that Plaintiff had his lease in his hand and, thereafter, emphatically stated that Mitchell had no authority to enter into the Plaintiff's residence.

55) As such, Plaintiff explicitly refused to consent to both Mitchell's and the Officers entry into Plaintiff's residence.

56) Thereafter, Plaintiff did then hear Officer White ask Mitchell whether she in fact lived in the Plaintiff's residence, to which Mitchell replied, "No, not any more, but my belongings are up there and he assaulted me".

57) Thereafter, the phone call was terminated from the Defendants' end.

58) At this time, there were no exigent circumstances known to the Officer which would allow for the warrantless entry into Plaintiff's residence.

59) Thereafter, the Defendants all conspired to violate Plaintiff's Constitutional rights in the following manner: (1) Mitchell would provide the Officers with the illegal copy of keys to Plaintiff's residence; (2) The Officers would use those keys to gain unlawful access to Plaintiff's residential building; (3) Once therein, Officers would again use said illegal keys to gain unlawful access to Plaintiff's residence (#5h); (4)Officers would then arrest Plaintiff in his home without a warrant; (5) Officers would then use excessive force upon the Plaintiff; (6) The Officers would then search Plaintiff's residence under Mitchell's invalid consent; (7) The Defendants would then deprive Plaintiff of his property without due process of law under the State procedure found in New York C.P.L. §530.11.

60) The following facts are the actions taken by the Defendants in the furtherance of the above conspiracy, to which, all of the Defendants knowingly and willingly agreed to commit.

61) Upon information and belief, the Officers obtained the illegal copy of Plaintiff's keys from Mitchell, and thereafter, used those keys to unlawfully enter Plaintiff's residential building.

62) Once inside Plaintiff's residential building, all of the Defendants did make their was to the fifth floor therein, where Plaintiff's residence (#5h) was located.

63) Upon the Defendants' arrival on the fifth floor, the Defendants located Plaintiff's residence's front door, and once located, the Officers proceeded to "jiggle" the Plaintiff's front door knob, checking to see whether said door was locked.

64) Plaintiff, who was home alone, upon hearing sounds coming from his residential hallway, and, upon hearing his front door knob "jiggle", walked towards his front door, and out of fear and curiosity asked who was there, but the Defendants did not identify themselves.

65) At this time there were no exigent circumstances justifying or warranting the Defendant's warrantless entry into Plaintiff's residence.

66) The Plaintiff, then realizing that the sounds coming from his residential hallway were none other than the Defendants, then said through his closed and locked residential front door to the Defendants gathered outside, "Kimberly, I don't care who you are with, I'm calling the police right now! Get away from my apartment!".

67) As such the Plaintiff, who was at his residential threshold and behind his locked residential door, explicitly refused to consent to the entry into his residence by the Defendants herein.

68) Thereafter, while Plaintiff was removing his cell phone from his pocket to call the police, Plaintiff heard the sounds of shaking keys, and thereafter, the Officers used those keys to unlock Plaintiff's locked residential front door.

69) Thereafter, the Officers, without identifying themselves as such, quickly forced there way into Plaintiff's residence.

70) Plaintiff backed away from his residential front door, turned and attempted to move into the open living space of his one-room apartment, to escape what he reasonably believed were illegal intruders, but, the Officers with their guns drawn screamed "Freeze or I''l shoot!" which, caused the Plaintiff to immediately stop and surrender peacefully.

71) Plaintiff in no way resisted the Officers who were arresting him and Plaintiff complied with all of the Officers' orders, which were, for Plaintiff to lay on his stomach, hands behind his head, with his feet crossed.

72) One of the Officers than proceeded to sit upon Plaintiff's lower back and remove Plaintiff's hands from behind his head to behind his back , but did so in a jerking fashion, which caused Plaintiff to suffer pain (See, ¶'s #123 - #126, infra, herein).

73) This same Officer than hand cuffed Plaintiff while the another Officer threatened Plaintiff with physical violence by stating, "So, you like to beat girls up, huh? What if we beat you up?"

74) Plaintiff, recognized the Officer's statement as a threat to cause Plaintiff harm, which as a direct and proximate result caused Plaintiff to suffer extreme emotional distress and mental anguish (See, ¶'s #126, infra, herein), so Plaintiff stated to said Officer that he had done nothing wrong and begged for the Officers not to harm him.

75) The Officers then used gratuitous excessive force upon the already subdued and cooperating Plaintiff, to wit: by grabbing the chain of the cuffs affixed to Plaintiff's wrists and lifting the Plaintiff into a standing position by pulling on said cuffs until Plaintiff's arms were in a reverse position, as the cuffs were locked behind Plaintiff's back, and once Plaintiff was in a standing position the Officers continued to lift the Plaintiff's arms in this manner until Plaintiff's arms were above his head and the Plaintiff was bent over and barely standing on his toes.

76) Thereafter, a loud "popping" sound came from Plaintiff's shoulder sockets, which as a direct and proximate result caused Plaintiff to suffer substantial pain and injuries (See, ¶'s #124 - #126, infra, herein).

77) Plaintiff, in response to the pain he was feeling, and in fear that his shoulders had been dislocated, screamed "Stop!, Please stop!".

78) Thereafter, the Officers let the Plaintiff's arms down.

79) Thereafter, as the first Officer held Plaintiff by the cuffs, the other Officer made several "swinging gestures" towards Plaintiff's face, as if said Officer were going to punch Plaintiff in the face, which as a direct and proximate result caused the Plaintiff to suffer extreme emotional distress, mental anguish, and fear, as the Plaintiff feared that as no other persons were there to come to the Plaintiff's aid these Officers would cause the Plaintiff further harm (See, ¶ #126, infra, herein).

80) Thereafter, the Officer holding the Plaintiff by the cuffs, and seeing the Plaintiff responding in fear to the other Officer's threatening gestures, stated, "See, he's not a man, he's a scared little girl himself."

81) This second Officer then stated, "Have a seat then little girl", while at the same time pulling downward on the cuffs with enough force to slam the Plaintiff down on the floor in a seated position, which, as a direct and proximate result caused the Plaintiff to suffer injuries to his back bone, tail bone, thigh bone, and lower back. (See, ¶'s #123 - #126, infra, herein).

82) After suffering the above injuries, Plaintiff, fearing that the Officers were going to continue to cause Plaintiff additional injuries began to cry, and asked both Officers, "What did I do?", to which the Officers responded, "Shut up, you know what you did".

83) Plaintiff then stated "I don't know what's going on but I'm cooperating, please don't hurt me anymore", and at that time, in the Plaintiff's mind, Plaintiff believed that he was going to be hurt further or even killed by these Officer, which, as a direct and proximate result, caused the Plaintiff to suffer extreme emotional distress, mental anguish, fear and anxiety, (See, ¶ #126, infra, herein).

84) Thereafter, another Officer entered into the Plaintiff's residence and asked the Officers therein whether they had searched the Plaintiff's residence for weapons, to which the Officers replied, "No".

85) Immediately thereafter, Plaintiff asked this new Officer how these Officers could both enter into and search the Plaintiff's residence without a warrant.

86) Plaintiff further informed said Officer that the Officers had no right to search Plaintiff's residence as the Plaintiff did not and would not give the Officers permission to conduct a search of Plaintiff's residence.

87) As such, Plaintiff explicitly refused to consent to the search of his residence.

88) Thereafter, faced with Plaintiff's refusal to consent to the search of Plaintiff's residence, this same Officer then went out into the fifth floor residential hallway, and, in a very loud voice, did ask Mitchell if they could have her consent to search the Plaintiff's residence, to which Mitchell replied, "Yes, you can search it. I think he has a gun in there, but I know for sure that he should have some weed in there, and it should be in the kitchen cabinet".

89) This Officer then re-entered Plaintiff's residence and stated to the Plaintiff, "See, we don't need your permission, we have hers", to which the Plaintiff responded, "But she doesn't even live here", to which the other Officers responded, "Shut up faggot".

90) The Officers then began to unlawfully search the Plaintiff's residence without the Plaintiff's consent.

91) The Officers searched said residence in a "top-to-bottom", "ransacking" fashion by, inter alia: flipping over the Plaintiff's bed and searching underneath it; removing all of the contents of Plaintiff's kitchen cabinets and searching through them; removing all of the contents of the Plaintiff's closet and searching through them; removing all of the contents of Plaintiff's bathroom and searching through them; removing all of the contents of Plaintiff's high hallway cabinets and searching through them; and, searching through all of the places in Plaintiff's living area (e.g., bookcase; sofa cushions; desk; shelves; boxes; e.t.c).

92) The Officers also searched all of Plaintiff's personal papers and effects and did throw around all searched items with sheer disregard to the value and/or importance of Plaintiff's property.

93) During this entire serached, the Officers continuously requested that Plaintiff "Just tell us where the shit is and we'll stop tossing your place", to which Plaintiff responded, "I have no gun and I have no drugs. She's lying to you, there is nothing in my house".

94) At no time during or after the search was any contraband, drugs, weapons, or anything illegal found within Plaintiff's residence by the Officers conducting said search.

95) Thereafter, Plaintiff was taken out of his residence by the above Officers and brought into the fifth floor residential hallway.

96) Once in this hallway, another Officer, previously unseen by the Plaintiff, stated, "Is this the little fuck face who likes to beat on women?".

97) Thereafter, the previously unseen Officer did begin to make several violent gestures towards Plaintiff's face, in the form of swinging at the Plaintiff's face as if said Officer were going to punch Plaintiff in the face.

98) As a direct and proximate result of this Officer's violent gestures, Plaintiff suffered extreme emotional distress, mental injuries and Plaintiff did recoil in fear, as Plaintiff believed he would be punched in the face by this Officer (See, ¶ #126, infra, herein).

99) Thereafter, upon seeing Plaintiff respond in fear to the Officer's continuous gestures, all of the Officers in the fifth floor residential hallway began to laugh at the Plaintiff, which as a direct and proximate result caused the Plaintiff to suffer mental injuries (See, ¶¶#126, infra, herein), shame and ridicule.

100) This same Officer then stated, "Get this little faggot out of here", which as a direct and proximate result caused Plaintiff to suffer shame, ridicule depression and mental injuries (See, ¶ #126, infra herein).

101) Plaintiff was then led onto his residential elevator by the two Officers who originally cuffed and assaulted Plaintiff, where, once the elevator doors closed and Plaintiff was alone with said Officers, said Officers began to threaten Plaintiff by stating, inter alia, "You're lucky she's not my daughter or I'd kill you right here", while at the same time tapping on his holstered revolver, which the Plaintiff saw as a direct threat on his life, and, as a direct and proximate result caused Plaintiff mental injury (See ¶ #126, infra).

102) The Other Officer on the elevator than asked Plaintiff what
he was doing "living in a nice neighborhood like this", and then
stated, "I thought niggers like you only lived in the hood", which
as a direct and proximate result cased Plaintiff to suffer shame,
ridicule, and mental injuries (See, ¶ #126, infra, herein).

103) After exiting said elevator on the residential building's first
floor, Plaintiff was escorted out of said building into the street
and placed in an unmarked vehicle and taken to what Plaintiff believed
was the 19th precinct, by said Officers.

104) During Plaintiff's transportation to said precinct, said Officers
continuously threatened Plaintiff's life by stating that they were
going to take Plaintiff somewhere where nobody would find him.

105) As a direct and proximate result of these threats, Plaintiff
became extremely fearful for his safety and life, and said threats
did cause the Plaintiff to suffer mental injuries (See, ¶ #126,
infra herein).

106) Upon arrival at the 19th precinct, Plaintiff felt extremely
relived that he had not been further injured by these Officers, and
thereafter, Plaintiff was placed into a holding cell by himself.

107) As a direct and proximate result of the injuries inflicted upon
the Plaintiff by the Officers (See, ¶'s #123- #126, infra, herein),
Plaintiff was not able to sit down in this holding cell, for when he
tried to sit, Plaintiff felt extreme pain in his buttocks and back.

108) The pain that the Plaintiff felt from his lower back, spine, and buttocks was so extreme that Plaintiff could not sit, so instead, Plaintiff laid on the floor of the holding cell.

109) A short time thereafter, Officer Odonoghue (hereinafter referred to as "Odonoghue") did enter into the room in which the holding cell was located and did inform Plaintiff that Mitchell was about to be escorted back to Plaintiff's residence so that she would be able to retrieve her belongings from within.

110) Plaintiff did then immediately inform Odonoghue of all the same facts that Plaintiff had informed the other Officers of prior to their unlawful entry (See, ¶'s #44 - #57, supra, herein), specifically informing Odonoghue that: Mitchell does not live at Plaintiff's residence; Mitchell has no authority over Plaintiff's residence and could not enter therin; Mitchell had no belongings in Plaintiff's residence; Mitchell's possession of keys to Plaintiff's residence was illegal; and, that Mitchell and the Officers unlawfully entered into Plaintiff's residence and were about to unlawfully enter it again.

111) Plaintiff did then request Odonoghue to intercede on Plaintiff's behalf to stop the violation of Plaintiff's Constitutional rights, to wit: the unlawful re-entry, to which Odonoghue responded, "There is nothing I can do".

112) Plaintiff then asked Odonoghue "Well, what if she steals something?", to which Odonoghue replied, "If you have a dispute over property, that would be a civil issue, so you'll have to sue her for it in Court".

113) Officer Odonoghue explicitly refused to intercede to prevent the Officers' and Mitchell's unlawful re-entry into Plaintiff's residence and/or violations of Plaintiff's Constitutional rights.

114) Thereafter, Mitchell was escorted back to Plaintiff's residence pursuant to New York C.P.L. §530.11, and under said Statute the Officers' used the unauthorized copy of keys to Plaintiff's residence to gain unlawful access, and once therein, under the same Statute, did confiscate various items of Plaintiff's personal property, to wit: 2 family heirlooms in the form of an antique men's gold watch, and a gold men's ring; Plaintiff's deceased grandmother's necklace; 3 solid silver cuff links; 2 gold cuff links; a digital camera; and, the Plaintiff's daughter's engraved gold baby bracelet.

115) Thereafter, on December 9th, 2009, at on or about 12:15a.m., after being released by a New York County Criminal Court Judge on his own recognizance, Plaintiff returned to his residence and entered therein and did discover that the above stated property (See, ¶ #114, supra) was missing from Plaintiff's residence.

### VIOLATIONS OF PLAINTIFF'S CONSTITUTIONAL RIGHTS AND INJURIES PLAINTIFF SUFFERED

116) Plaintiff hereby incorporates by reference all of the allegations contained in paragraphs #1 - #115, herein.

117) All of the Defendants herein, violated; conspired to violate; and, failed to intercede to prevent the violations of Plaintiff's clearly established Constitutional rights, both knowingly and willingly.

118) The Defendants violated the clearly established Constitutional rights of the Plaintiff, which they should have known.

119) The Officers deprived Plaintiff of equal protection  of law by ignoring Plaintiff's criminal complaint against Mitchell and refusing to arrest Mitchell for the crimes she committed against the Plaintiff.

120) The Officers' selective treatment, to wit: arresting Plaintiff while refusing to arrest Mitchell even though both were similarly situated, bore no rational relationship to the legitimate governmental interest in impartial law enforcement, but instead, said selective treatment was based on the impermissable consideration of, inter alia, Plaintiff's gender; Mitchell's claim of being a domestic violence victim; the Officers' use of the so-called "first come first served" complaint policy, wherein the earliest filed complaint of two cross complaints receives preference over the latter filed complaint; and, the Officers deprived Plaintiff of equal protection as 'a class of one', by intentionally treating Plaintiff different from Mitchell who was similarly situated and there being no rational basis for the Officers' treating Plaintiff differently, as both Plaintiff and Mitchell were alleged to have committed crimes against each other and there was no rational reason to refuse to arrest Mitchell for crimes which were more serious than what Plaintiff was arrested for, and the difference in treatment is sufficient to exclude any possibility that the Officers acted, or failed to act on the basis of mistake.

121) The Officers and Mitchell continuously unlawfully entered into the Plaintiff's residence in violation of Plaintiff's Constitutional rights.

122) As a direct and proximate result of the unlawful entries into Plaintiff's residence, Plaintiff suffered an invasion of his privacy.

123) As a direct and proximate result of the Defendant's use of excessive force, the Plaintiff suffered physical injuries in the form of substantial pain; substantial swelling and bruising to Plaintiff's lower back, spine, thigh bone, tail bone, back bone resulting in a permanent and pronounced limp when the Plaintiff walks and an inability for Plaintiff to stay seated for long periods of time due to pain; nerve damage to Plaintiff's spine and back which is permanent; and, Plaintiff suffered blood in his stool for up to or about two (2) weeks after the incident complained of herein.

124) As a direct and proximate result of the Defendants' use of excessive force , Plaintiff suffered further substantial pain in his shoulders; partial dislocation of his shoulders; substantial swelling and bruising of the shoulder region, resulting in permanent pain in the Plaintiff's shoulders and a permanent "popping" sound in the Plaintiff's shoulders when the shoulders are rotated.

125) The aforementioned swelling and bruising to the areas described above (See, ¶'s #123 -#124) lasted for well over a month after the incident complained of herein occurred.

126) As a direct and proximate result of the Defendants' violations enumerated herein, Plaintiff has suffered extreme emotional distress; mental anguish; inability to sleep properly; reoccurring nightmares of the incident herein; uncontrollable fear of police officers; post-traumatic stress disorder; anxiety; and, depression.

127) The Defendants herein deprived Plaintiff of his property without due process of law by using the established procedure encoded in New York's C.P.L. §530.11, which Statute authorized the Officers to escort Mitchell to Plaintiff's residence and, once therein, irrespective of how entry was gained, remove the Plaintiff's property under the claim that said property belongs to Mitchell, without Mitchell having to provide any proof that said property actually belonged to Mitchell and not to the Plaintiff.

128) As such, the deprivation of Plaintiff's property by the Defendants was not a random and unauthorized act, but instead, was an act of deprivation authorized by a New York State Statute.

129) This Statute (N.Y. C.P.L. §530.11) does not provide Plaintiff with any pre-deprivation notice, or access to a tribunal in which the merits of the deprivation may be fairly challenged, nor does New York State provide adequate post-deprivation remedies for the Plaintiff under the circumstances.

130) As such, N.Y. C.P.L. §530.11 is unconstitutional in that it is allows for the deprivation of property without due process of law; is unconstitutionally vague; and does not take into consideration the Plaintiff's property rights, or, others similarly situated.

131) The herein mentioned misconduct of the Defendants constitutes a blatant, willing and unwarranted departure from the standards of and morality expected in our society, and, "shocks the conscious'.

132) Each Defendant herein did cause; contribute to; encourage; conspire to; engage in; and, fail to intercede to stop, all of the violations of Plaintiff's well-established Constitutional rights, both knowingly and willingly.

133) Any exigent circumstances herein were created by the Defendants' unlawful conduct.

134) All injuries sustained by Plaintiff resulted from and was caused by the Defendants' own culpable conduct with malice.

135) The Defendants are not entitled to immunity, whether qualified or absolute, or other.

136) Plaintiff's claims are not barred by any applicable Statute of limitations, or, by doctrines of Res Judicata or collateral Estoppel.

137) The entire incident complained of herein was provoked by and/or initiated by the Defendants.

138) Punitive damages are warranted due to the Defendants deliberate and malicious conduct.

## RELIEF SOUGHT

139) Plaintiff hereby incorporates by reference all of the allegations contained in paragraphs #1 - #138, supra, herein.

140) Plaintiff requests an Order Declaring that the herein-named Defendants have violated Plaintiff's Constitutional rights.

141) Plaintiff further requests an Order Declaring that Defendant Mitchell violated Plaintiff's Constitutional rights and also did commit various torts against the Plaintiff.

142) Plaintiff requests Compensatory relief in the amount of $3,000,000 (U.S.D.) from the Defendants herein.

143) Plaintiff requests additional Compensatory relief from Defendant Mitchell in the amount of $100,000 (U.S.D.).

144) Plaintiff requests Punitive damages in the amount of $4,000,000 (U.S.D.) from the Defendants, for said Defendants deliberate, and intentional and malicious conduct herein.

145) Plaintiff further requests Punitive damages from Defendant Mitchell in the amount of $100,000 (U.S.D.) for said Defendant's deliberate, intentional and malicious conduct.

I declare, under penalty of perjury that the foregoing is both true and correct, and based upon my personal knowledge, information and belief.

signed this _14_, day of November, 2014:

DONNELL BAINES, PLAINTIFF PRO SE

DONNELL BAINES
DIN# 13A2136
FIVE POINTS CORRECTIONAL
STATE ROUTE 96, P.O. BOX 119
ROMULUS, NEW YORK, 14541

NOVEMBER 11th, 2014.

BY REGULAR U.S.P.S. MAIL

TO: THE HONORABLE JESSE M. FURMAN
    UNITED STATES DISTRICT JUDGE
    UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK     10-CIV-9545 (JMF)
    500 PEARL STREET
    PRO SE OFFICE, ROOM 230
    NEW YORK, NEW YORK, 10007

RE: THE FILING OF THE ENCLOSED AMENDED COMPLAINT.

Dear Clerk,

    I, Donnell Baines, am the Plaintiff in the matter of Baines v. City of New York, et al., (10-CIV-9545; JMF), and I write this letter to you requesting that you file the enclosed Amended Complaint in the above action.

    On or about November 2, 2014, I received an Order From the Honorable Jesse M. Furman (U.S.D.J.) wherein said Judge granted this Plaintiff the opportunity to amend the complaint in this action.

    Please file the complaint herein at your earliest possible convenience. Thank you for your time and consideration in this matter of mine.

Truly Yours,

DONNELL BAINES, PLAINTIFF
(PRO SE)

RECEIVED
NOV 17 2014
PRO SE OFFICE



USMS
SDNY

RECEIVED
NOV 17 2014
PRO SE OFFICE